**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTMARK INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Harry D. Leinenweber |
| | ) | |
| v. | ) | No. 09 C 6169 |
| | ) | |
| CLARENDON NATIONAL INSURANCE COMPANY and CLARENDON AMERICA INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTMARK INSURANCE
COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION**

TRUSTMARK INSURANCE COMPANY
By Its Attorneys
David M. Spector
Everett J. Cygal
Amy M. Rubenstein
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606-6473
Tel:     (312) 258-5500

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................ 2

        A.      The International II Arbitration ................................................................ 2

        B.      The VQS II Arbitration ........................................................................... 3

                1.      Clarendon's Attempt to Consolidate the Arbitrations ............................ 3

                2.      Clarendon Abandons the VQS II Arbitration ........................................ 5

                3.      The Interrelationship Between the VQS II and the International II
                        and Clarendon's Stated Objective of Taking Inconsistent Positions
                        Between the Two Arbitrations .................................................................. 5

III.    ARGUMENT ...................................................................................................... 7

        A.      Trustmark Is Likely to Prevail on the Merits ......................................... 9

                1.      Trustmark Is Likely to Prevail on Its Claim for Breach of the
                        Confidentiality Agreement Because Clarendon Will Inevitably
                        Disclose Confidential Panel Deliberations from the Prior
                        Arbitration ............................................................................................... 9

                2.      Trustmark Is Likely to Prevail on Its Claim for Breach of the
                        Confidentiality Agreement Because Clarendon Has Repudiated the
                        Confidentiality Agreement .................................................................... 13

                3.      Trustmark Is Likely to Prevail on Its Request to Disqualify
                        Clarendon's Arbitrator Because She Is Not Disinterested ................... 17

        B.      Trustmark Will Be Irreparably Harmed in the Absence of an Injunction
                and Has No Adequate Remedy at Law ................................................... 19

                1.      Trustmark Will Be Irreparably Harmed by Clarendon's Breach of
                        the Confidentiality Agreement if an Injunction Is Not Issued ............. 19

                2.      Trustmark Will Suffer Irreparable Harm if Clarendon's Arbitrator
                        Participates in the VQS II Arbitration .................................................. 20

        C.      Clarendon Will Not be Significantly Harmed by a Preliminary Injunction ........ 21

        D.      A Preliminary Injunction Is in the Public Interest ............................... 22

IV.     CONCLUSION .................................................................................................. 23

i

Plaintiff Trustmark Insurance Company ("Trustmark") submits this memorandum of law in support of its Motion for a Preliminary Injunction against Clarendon America Insurance Company and Clarendon National Insurance Company (collectively "the Clarendon Parties" or "Clarendon") to compel arbitration pursuant to the terms of the parties' arbitration agreement and to prevent Clarendon from violating the parties' confidentiality agreement.

Trustmark requests a preliminary injunction, to be made permanent after trial, enjoining Clarendon and its officers, agents, servants, employees, attorneys and other persons who are in active concert or participation with them, who receive notice of the order by personal service or otherwise, from:

     i.     breaching a confidentiality agreement entered by the parties;

    ii.     appointing Clarendon's Arbitrator from a prior arbitration as an arbitrator in a second, related arbitration; and

   iii.     participating in the second arbitration so long as Clarendon's Arbitrator is purporting to participate as an arbitrator.

## I.    <u>INTRODUCTION</u>

This case involves the question of whether Clarendon can appoint the same party-arbitrator in two separate and distinct arbitrations where: (i) the resolution of the second arbitration will depend upon an interpretation of the first arbitration's award; (ii) Clarendon's party-appointed arbitrator will necessarily have to disclose confidential panel deliberations from the first arbitration in the course of discussing Clarendon's case in the second arbitration; and (iii) Clarendon and its party-appointed arbitrator are prohibited by a written confidentiality agreement from disclosing the first panel's deliberations to anyone, including the second panel.

Clarendon's party-appointed arbitrator's participation in the second arbitration should be enjoined in accordance with the terms of the confidentiality agreement that provides:

> The parties recognize that serious injury could result to any party and its business if another party breaches its obligations under this Agreement. Therefore, **each party agrees that all parties will be entitled to seek a restraining order, injunction or other equitable relief if another party breaches its obligations under this Agreement**, in addition to any other remedies and damages that would be available at law or equity.

(Exhibit 1, § 6). Clarendon's party-appointed arbitrator agreed on the record to the confidentiality agreement but has since refused to sign that agreement, even though the other two panel members and both parties have. Seizing on its arbitrator's refusal to sign in accordance with her prior agreement, Clarendon apparently claims it can use her in a second arbitrations as a vehicle to disclose with immunity protected, confidential information from the first arbitration.

## II.    FACTUAL BACKGROUND

In order to fully understand the issues in the case at bar, it is necessary to understand that there are two separate reinsurance agreements between the parties and any disputes under them must be resolved in two separate arbitrations.

### A.    The International II Arbitration

The first arbitration between Clarendon and Trustmark involved reinsurance the Clarendon Parties provided to Trustmark under certain excess of loss agreements, referred to as the "1998 International XOL treaties" (the "International II treaties" or the "International II Arbitration") (Exhibit 2). In 2006, Trustmark initiated an arbitration against the Clarendon Parties under the arbitration provision of the 1998 International XOL treaties (Exhibit 3), and a three-member arbitration panel (the "International II Panel") was convened to resolve the dispute. The Clarendon Parties appointed an arbitrator to serve on the Panel ("Clarendon's Arbitrator"),[1] Trustmark appointed an arbitrator, and an umpire was selected by an agreed-upon

---

[1] The Clarendon Parties repeatedly reference their arbitrator by name in their Motion to Dismiss and supporting Brief, but Trustmark elected not to refer to her by name in its Complaint and will continue with that convention.

process.  The International II Panel issued a "Second Corrected Final Award" on March 20, 2009

("Final Award").  (Exhibit 4).  The Honorable David H. Coar recently granted Trustmark's

motion to confirm the International II Arbitration Final Award.  *Trustmark Ins. Co. v. Clarendon*

*Nat'l Ins. Co.*, No 09 C 1637, 2009 WL 4043110, at *1-2 (N.D. Ill. Nov. 20, 2009).

### B.    The VQS II Arbitration

Effective June 1, 1997, Clarendon participated as a reinsurer on a quota share treaty

known as the "Variable Quota Share Treaty" ("VQS I").  (Exhibit 5).  The VQS I was effective

June 1, 1997.  Effective June 1, 1998, VQS was renewed by slip agreement ("VQS II" or "VQS

II treaty").  (Exhibit 6).  Although the VQS II slip agreement was not memorialized in a full form

agreement, the parties intended that the arbitration clause in the VQS II treaty would be identical

to the arbitration article (Article XVI) in its immediately predecessor contract.  (*See* Exhibits 5

and 6).

Clarendon admits that had the VQS II slip been reduced to a fully worded treaty, it would

have contained an identical arbitration clause as the fully worded VQS I treaty and that the

arbitration clause requires that all arbitrators be "disinterested."  (Docket Entry # 18, Clarendon

Amended Brief in Support of Motion to Dismiss, at 3 (relying on VQS I arbitration clause

wording)).   In accordance with the arbitration clause, on July 7, 2006, Clarendon cross-

demanded arbitration against Trustmark both with respect to the 1998 International XOL treaties

and VQS II treaty (the "VQS II Arbitration").  (Exhibit 7).

### 1.    Clarendon's Attempt to Consolidate the Arbitrations

Some, but not all, of the risks ceded by Trustmark to the International II treaties, effective

October 1, 1998 on a risks attaching basis, were also ceded by Trustmark to the VQS II treaty,

effective June 1, 1998 on a risks attaching basis.  (Exhibit 8, ¶ 7).

Clarendon named the same party-appointed arbitrator in the VQS II Arbitration as it had

in the International II Arbitration and demanded that the two arbitrations be consolidated because "it makes sense to resolve all of our clients' disputes over this business in a single proceeding." (Exhibit 7). The International II Panel denied Clarendon's consolidation demand, and the International II Arbitration proceeded. (Exhibit 9).

Prior to the April 12, 2007 Organizational Meeting, the parties agreed to enter into the standard form ARIAS Confidentiality Agreement (Exhibit 10) with some minor amendments not relevant to this case (Exhibit 11, pgs 20:5-21:15). On April 12, 2007, the International II Panel convened an Organizational Meeting. (Exhibit 11). All parties and each Panel member, including Clarendon's Arbitrator, agreed on the record to be bound by a confidentiality agreement (the "Confidentiality Agreement") that "remain[s] in effect even after conclusion of the arbitration proceedings." (Exhibit 1, § 2; Exhibits 11-13). In fact, speaking for and on behalf of the Panel, the Umpire (or neutral) stated that the International II Panel that it would be bound by the Confidentiality Agreement:

> UMPIRE HABER: Okay. With regard to the confidentiality agreement, that is something that is to be executed by everyone.
>
> I would state on behalf of the panel that as far as we are concerned, it's clearly confidential, and we will disclose to no one, because panels don't do that anyway. However, we will execute in any manner that you deem efficient.
>
> \*       \*       \*
>
> Have you made any changes from the ARIAS form is one of the things you should tell the panel.
>
> MR. CYGAL: This is Mr. Cygal. Yeah, there will be a few changes as to parties with whom information and documents may be shared both on Clarendon's side as well as on Trustmark's side. I don't know if you want the details of that or not.
>
> UMPIRE HABER: Have both of you agreed?
>
> MR. CYGAL: I believe that's the case.

- 4 -

UMPIRE HABER:  Mr. Ludwig, do you agree with that?

MR. LUDWIG:  Yes.

(Exhibit 11, pgs 20:5-21:15). Among the parties and three Panel members, only Clarendon's Arbitrator has refused to actually sign that agreement.  (Exhibit 1, § 2; Exhibits 12-13).[2]

### 2.  Clarendon Abandons the VQS II Arbitration

Trustmark never agreed to stay the VQS II Arbitration pending the outcome of the International II Arbitration.  (Exhibit 8, ¶ 6).  And after Clarendon's failed consolidation attempt, nothing more was heard of Clarendon's VQS II Arbitration demand until after the International II Panel issued it Final Award on March 20, 2009.   (Exhibit 4).   On August 17, 2009, Clarendon's Arbitrator approached Trustmark's party-appointed in the VQS II Arbitration (who is a different individual than Trustmark's party-appointed arbitrator in the International II Arbitration) to get the VQS II Arbitration proceedings under way.

On August 19, 2009, Trustmark's counsel wrote Clarendon's Arbitrator requesting that she voluntarily decline to serve as Clarendon's party-appointed arbitrator in the VQS II Arbitration.  (Exhibit 14).  Trustmark's counsel also wrote to Clarendon's counsel and requested that Clarendon appoint a new arbitrator within 30 days, as required under the arbitration agreement.  (Exhibit 15).  Clarendon refused to appoint a disinterested arbitrator (Exhibit 16), and, to date, Clarendon's Arbitrator has not responded to the request that she voluntarily resign.

### 3.  The Interrelationship Between the VQS II and the International II and Clarendon's Stated Objective of Taking Inconsistent Positions Between the Two Arbitrations

As stated above, certain risks are ceded to both the International II and the VQS II.  The

---

[2] Clarendon's Arbitrator's lack of a signature is irrelevant for the purposes of this Motion in that Clarendon has agreed be bound to the Confidentiality Agreement and Clarendon is breaching that agreement with its appointment of Clarendon's Arbitrator.  Accordingly, the Court can enjoin Clarendon's breach of the Confidentiality Agreement.

International II, among others provisions, contained a "Net Retained Lines" and a "Ultimate Net Loss" Clause. Although the specifics as to the operation of those clauses are not necessary for the resolution of this matter, it is important to note that Clarendon, in briefing, argument, and through its paid experts and fact witnesses, advanced a certain interpretation of the meaning of these two clauses. By way of example only, Clarendon argued: "if an account is ceded to both reinsurance programs, Trustmark must first cede it to the VQS. Only after application of the VQS and any other reinsurances, can Trustmark cede the 33% it retains on its 67% VQS to the International Treaties." (Exhibit 17, p. 45).

After receipt of hundreds of exhibits, the testimony of 10 fact and expert witnesses, and nine days of hearing and argument, the International II Panel issued its "Award" on October 15, 2008. (Exhibit 18). The Panel retained jurisdiction to resolve any disputes relating to a revised accounting. During that hearing, Trustmark asked the International II Panel to issue a Clarified Award specifically setting forth its interpretation of the Net Retained Lines and Ultimate Net Loss Clauses, consistent with the position Clarendon took and prevailed on during the International II Arbitration. Despite obtaining the relief it sought, Clarendon strenuously contested Trustmark's request for clarification:

> [Trustmark's Counsel] This is not an issue of the Variable Quota Share at all. It's not a ruling on the merits of the Variable Quota Share, it is not treading on the Variable Quota Share's panel's authority or jurisdiction. All this is doing is telling the Variable Quota Share panel how this Panel interpreted contract language in this slip in this treaty, because the only way you get there is by looking at the net retained lines and the ultimate net loss clauses of the International. Those clauses aren't in the VQS. This is not a request for an interpretation, or a ruling or an advisory ruling with respect to the Variable Quota Share. All it is is a description by this Panel of how it read these two clauses contained in the treaty that's before this Panel. This Panel certainly has jurisdiction to order that, and it would be totally appropriate.

> Now, Mr. Ludwig has made a plea that he doesn't want mischief before the VQS panel. Well, neither do we. If Mr. Ludwig meant what he said when he said Clarendon argued if you are going to cede them first, it has to go to the VQS

- 6 -

and then to the International, they should have no problem, objection to stipulating to that inclusion in this Panel's award of that specific language. And in fact, if Clarendon agrees to that, I think we can move on to the other issues and dispose of this right now.

> THE UMPIRE:  Mr. Ludwig.

> MR. LUDWIG:  I don't agree, because I don't think that's what the Panel ordered.  The Panel didn't –

> THE UMPIRE:  That's fine, you don't agree.  Keep going.

(Exhibit 19, pgs. 59:24 - 61:19).

In fact, Clarendon was so bold as to advise the International II Panel that it fully expected to re-litigate (and take a contrary position) in the VQS II Arbitration: "The parties will almost certainly at this point have a dispute over what impact this award has on the VQS."  (Exhibit 19, pgs. 114:11-14).  On March 20, 2009, the Panel clarified its award in the manner requested by Trustmark:

> 1. The Panel hereby clarifies and supplements its October 15, 2008 Award as follows:
>> a. The Panel finds that the Parties have agreed that the Panel should look to the wordings of the predecessor International Treaties incepting October 1, 1997 (International I);
>> b. This Panel makes no decision with respect to the Variable Quota Share Treaties;
>> c. Pursuant to the Net Retained Lines and Ultimate Net Loss Clauses of the International II Treaties, for all claims on risks ceded by Trustmark to the International II Treaties, Trustmark must first make deductions for claims upon other reinsurances as required by such clauses when determining Trustmark's Ultimate Net Loss under the International II Treaties;
>> d. The first $25,000 of "Ultimate Net Loss" for each and every loss shall be retained net by Trustmark for its own account whenever a loss is presented to the International II Treaties.

(Exhibit 4).

## III.  ARGUMENT

It is certain that Clarendon will attempt to argue that the International II Panel's findings

with respect to the Net Retained Lines Clause and the Ultimate Net Loss Clause of the International II are either not binding on the VQS II or that the Final Award is ambiguous and does not mean what it says. Taking conflicting and inconsistent positions between arbitrations is not unheard of in the reinsurance industry. What is unheard of is a party using its party appointed arbitrator from one arbitration in a subsequent arbitration to impeach the prior arbitration panel's award. That is exactly what Clarendon seeks to do here.

Clarendon, having realized that it is in its financial incentive to back track upon the relief that it requested and received in the International II Arbitration, has admitted that it will take a conflicting position in the VQS II Arbitration. Clarendon hopes to do this by trashing the confidentiality of the International II Panel's deliberation through what is for all intents and purposes the testimony of its party-appointed arbitrator from the International II Arbitration. Clarendon's Arbitrator will not be subject to cross-examination and the other two International II panel members will not be present to explain their thinking to the VQS II Panel. The two other VQS II panel members will not know if Clarendon's Arbitrator's interpretation of the Final Award and description of the confidential International II deliberations are true and correct. In other words, the other two VQS II panel members will be at a distinct disadvantage because they will have no way of either testing or challenging the accuracy of Clarendon's Arbitrator's spin.

Clarendon comes before this Court with unclean hands. There are two separate and fundamental reasons why a preliminary injunction against Clarendon should issue in this matter:

    1.    An injunction is necessary to prevent Clarendon, directly or through Clarendon's Arbitrator, from breaching the Confidentiality Agreement and inevitably disclosing panel deliberations from the prior arbitration during the second, related arbitration between the same parties; and

    2.    An injunction is necessary to prevent Clarendon from breaching the arbitration clause's requirement that each member of the arbitration panel be "disinterested" by appointing an interested arbitrator who previously served as

Clarendon's party-appointed arbitrator in a prior and related arbitration between the parties.

As a general proposition, in deciding whether to grant preliminary injunctive relief, a court must consider five factors:

> As a threshold matter, plaintiffs must show 1) a likelihood of success on the merits, 2) irreparable harm if the preliminary injunction is denied, and 3) the inadequacy of any remedy at law. Once this threshold showing is made, the court balances 4) the harm to plaintiffs if the preliminary injunction were wrongfully denied against the harm to the defendant if the injunction were wrongfully granted, and 5) the impact on persons not directly concerned in the dispute (the "public interest").

*Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citations omitted). Because the Confidentiality Agreement expressly provides that it is to be enforced pursuant to an injunction (Exhibit 1, § 6), it is not at all clear that Trustmark is technically required to establish each of the five traditional elements supporting an injunction. Nevertheless, it is apparent that Trustmark can easily meet the traditional standard under these circumstances and that the five factors weigh heavily in favor of granting the requested relief.

### A. Trustmark Is Likely to Prevail on the Merits

A litigant meets the "likely to prevail on the merits" standard merely by showing that its chances of succeeding on the merits "are better than negligible." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984) (internal quotation marks and citations omitted). The evidence that supports Trustmark's claims far exceeds this minimal threshold.

### 1. Trustmark Is Likely to Prevail on Its Claim for Breach of the Confidentiality Agreement Because Clarendon Will Inevitably Disclose Confidential Panel Deliberations from the Prior Arbitration

Clarendon, Trustmark, and each member of the International II Panel entered into a Confidentiality Agreement that "remain[s] in effect even after conclusion of the arbitration proceedings." (Exhibit 1, § 2; Exhibits 11-13). Both Trustmark and Clarendon agreed as part of

the International II Arbitration that all documents and all depositions from the International II Arbitration could be used in a forthcoming VQS II Arbitration. (Exhibit 20, pgs. 9:20-10:8). It was never agreed, however, that any member of the International II Panel could breach confidentiality and disclose panel deliberations to anyone outside the panel. Thus, this Motion does not seek an injunction preventing the use of documents or discovery from the International II Arbitration in the VQS II Arbitration.

Rather, this Motion seeks to enjoin Clarendon, through Clarendon's Arbitrator, from breaching the Confidentiality Agreement by disclosing to the to-be-formed VQS II Panel the private and confidential International II Panel's deliberations. It is apparent that Clarendon's Arbitrator cannot possibly participate in the VQS II Arbitration without discussing the Final Award of the International II Panel and, thus, inevitably disclose the Panel's private deliberations. (It is submitted that there is no difference between a member of an arbitration panel explaining what an award means and disclosing deliberations. They are the same thing.)

To begin with, as Clarendon has long conceded, the VQS II Panel will have to apply and interpret the International II Arbitration Final Award. In fact, Clarendon foreshadowed that possibility when it sought consolidation and argued that "principles of collateral estoppel and res judicata clearly apply in arbitrations." (Exhibit 20, pgs. 44:13-19). Specifically, the International II Panel (including Clarendon's Arbitrator) decided issues related to the Net Retained Lines and Ultimate Net Loss Clauses of the International II treaties, which implicates how risks are ceded under the VQS II treaty. (Exhibit 8, ¶ 7; Exhibit 4). Judge David H. Coar recently granted Trustmark's motion to confirm the International II Arbitration Final Award. *Trustmark Ins. Co. v. Clarendon Nat'l Ins. Co., et al.*, No 09 C1637, 2009 WL 4043110, *1-2 (N.D. Ill. Nov. 20, 2009). That decision's collateral estoppel effect will come before the VQS II

Panel and Clarendon's Arbitrator's participation in that decision renders her ineligible under the Confidentiality Agreement to discuss its impact on the VQS II Arbitration. Clarendon's Arbitrator cannot decide how to interpret the International II Arbitration Final Award without inevitably drawing on her participation in confidential deliberations, discussions, and hearings.

Clarendon has freely and repeatedly emphasized the importance of interpreting the International II Arbitration Final Award in the context of the VQS II Arbitration. In its July 7, 2006 consolidation request, Clarendon's counsel highlighted the substantial overlap between the factual and legal matters at issue in the International II and VQS II Arbitrations. (Exhibit 7). And Clarendon minced no words in alerting Trustmark that the subject matter, content, and reasoning of the Panel's Final Award in the International II Arbitration would be central to the VQS II Arbitration. (Exhibit 20, pgs. 38:20-45:25). While Trustmark does not for a moment dispute the importance of the International II Arbitration Final Award in the VQS II Arbitration, it strongly objects to a member of the International II Panel discussing that Award or telling the other two members of the VQS II Panel what that Award means.

In determining what effect the International II Arbitration Final Award should have in the context of the dispute under the VQS II agreement, all three members of the VQS II Panel should be on even footing, as contemplated by the Confidentiality Agreement. The Confidentiality Agreement does not contemplate that one partisan member of the International II Panel could appear, in effect, as a permanent and unqualified witness in the VQS II Arbitration.[3]   Any

---

[3] As a member of the International II Panel, Clarendon's Arbitrator is immune from subpoena and is a wholly improper witness on any matter relating to the International II Arbitration. *See, e.g., Rubens v. Mason*, 387 F.3d 183, 191 (2d Cir. 2004) ("The [district court's] admission of [the arbitrator's] affidavit . . . violated well-settled law that testimony revealing the deliberative thought processes of judges, juries or arbitrators is inadmissible." (citing cases)); *Deiulemar Compagnia Di Navigazione, S.p.A. v. Transocean Coal Co., Inc.*, No. 03 Civ. 2038, 2004 WL 2721072, at *1 n.1 (S.D.N.Y. Nov. 30, 2004) ("[I]t is well established that arbitrators

representation by one VQS II panel member (Clarendon's Arbitrator) to the other two VQS II panel members as to what the International II Arbitration Final Award means or does not mean is, for all practical purposes, a disclosure of what Clarendon's Arbitrator claims were the motives and intent of the entire International II Panel. This is not only contrary to the specific Confidentiality Agreement entered into in the International II Arbitration, but it is also improper generally because arbitrators are expected to maintain the confidentiality of panel deliberations.[4]

Breach of confidentiality by any member of the International II Panel would be a matter for concern, but the potential disclosures by Clarendon's highly partisan arbitrator to a VQS II Panel composed of no one else familiar with the International II Arbitration is truly off the charts. After all, "party-appointed arbitrators are *supposed* to be advocates." *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.,* 307 F.3d 617, 620 (7th Cir. 2002) (emphasis in original). But for Clarendon's Arbitrator to fulfill her advocacy role, she will reveal or at least purport to reveal the International II Panel's deliberations by advancing her highly biased interpretation of what the International II Panel intended to accomplish. And here, Clarendon's Arbitrator would be an unrebutted voice because neither the Umpire, nor Trustmark's party arbitrator participated in the

---

may not be questioned regarding the arbitral decision-making process" (citing cases)). Nor can Clarendon's Arbitrator be relied upon to judge whether her participation in the VQS II arbitration violates the Confidentiality Agreement – "'[n]o [wo]man is allowed to be a judge in [her] own cause; because [her] interest would certainly bias [her] judgment, and, not improbably, corrupt [her] integrity.'" *Caperton v. A.T. Massey Coal Co., Inc.,* 129 S.Ct. 2252, 2259 (2009) (quoting The Federalist No. 10).

[4] Here, there is doubt that Clarendon and Clarendon's Arbitrator will inevitably disclose confidential information, including the International II Panel's deliberations, because Clarendon has promised to put the prior arbitration at issue. (Exhibit 7; Exhibit 20, pgs. 38:20-45:25). The doctrine of "inevitable disclosure" is well established in law, particularly in the area of employees possessing trade secrets who are hired away by competitors. *See Pepsico, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir. 1995). Courts have had no problem in recognizing that in such situations, the party possessing the confidential information will inevitably use or disclose those secrets, no matter how hard it (or she) may attempt to avoid such disclosure.

International II Arbitration, as of course they could not have. Clarendon's Arbitrator, by failing to respond to Trustmark's request to recuse herself and by failing to sign the Confidentiality Agreement, has demonstrated that she intends to fully participate as an advocate for Clarendon in the VQS II Arbitration. Clarendon should not be heard to complain if it is forced to comply with the Confidentiality Agreement to which it and its Arbitrator are bound.

> ### 2. Trustmark Is Likely to Prevail on Its Claim for Breach of the Confidentiality Agreement Because Clarendon Has Repudiated the Confidentiality Agreement

The International II Arbitration was conducted under the auspices of the Association Internationale de Droits des Assurances ("AIDA") and its U.S. affiliate, the AIDA Reinsurance and Insurance Arbitration Society ("ARIAS")[5], which uses tripartite panels. Each party named one panel member, and the two chose a neutral (called the "umpire"). *See, e.g., Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 307 F.3d 617, 620 (7th Cir. 2002) ("in the main party-appointed arbitrators are *supposed* to be advocates") (emphasis in the original).

Trustmark and Clarendon executed a formal Confidentiality Agreement based upon the ARIAS Standard form. (Exhibits 1, 10). On May 27, 2007, that agreement was sent to the International II Panel for signature. (Exhibit 21). Even though the Panel agreed during the Organizational Meeting through the Umpire to be bound by the Confidentiality Agreement, through an apparent oversight, the International II Panel did not execute the agreement. On October 16, 2009, Trustmark brought that oversight to the attention of the three former panelists and requested that each sign and return the same. (Exhibit 22). That same day, the Umpire (neutral) and the Trustmark party-appointed arbitrator executed the agreement. (Exhibits 12-13).

Despite being bound by the Confidentiality Agreement by the statements made by the

---

[5] ARIAS is a not-for-profit corporation that, among other things, certifies qualified reinsurance arbitrators.

- 13 -

Umpire for and on behalf of the Panel during the Organizational Meeting, Clarendon's Arbitrator was ominously silent. Indeed, to this day, Clarendon's Arbitrator has never signed the Confidential Agreement, explained why she is refusing to do so, or even responded Trustmark's October 16, 2009 e-mail. It is not unreasonable to assume that this silence was at the direction of Clarendon or its counsel.

In fact, on October 19, 2009, Clarendon's counsel wrote to the defunct panel and, in a thinly veiled instruction to its party-appointed arbitrator, instructed her not to sign the agreement:

> That being said, I note that two members of the Panel have already accepted Trustmark's invitation, based on the less than forthright explanation counsel for Trustmark provided. ***Clarendon does not believe that any of you need to do anything further.***

(Exhibit 23 (emphasis added)).

The purpose of such this blatant instruction is clear—Clarendon wants to take a conflicting position in the VQS II Arbitration and expects and desires its Arbitrator to explain away or contradict the International II Panel's Final Award by, among other things, divulging confidential information relating to the deliberations of the International II Panel. Clarendon has already made it clear in the context of its consolidation efforts that the VQS II Panel will have to interpret and apply the International II Arbitration Final Award. There is no way that Clarendon's Arbitrator can participate in the VQS II deliberations without breaching the disclosing the International II Panel's confidential deliberations. As set forth above, Clarendon's Arbitrator is not a neutral and is *supposed* to be an advocate. *Sphere Drake*, 307 F.3d at 620. The inherent unfairness of Clarendon's position is palpable. Trustmark's arbitrator and the neutral Umpire from the International II Panel will not be part of the VQS II Panel. Clarendon sees a tremendous advantage in having its advocate party-appointed arbitrator, with her unique knowledge from the International II Arbitration, on the VQS II Panel.

It is for this unfair advantage that Clarendon has repudiated the Confidentiality Agreement.  In its October 19, 2009 e-mail, Clarendon also stated:

> In any event, the **Panel Members are not parties to the Confidentiality Agreement**, which is specifically limited to Trustmark and Clarendon.  The Panel Member's signatures on the Confidentiality Agreement function as a judge's signature on a protective order and by signing**, the Panel members do not become parties to the agreement**.  We think the panel's promise on the record to maintain confidentiality is sufficient to protect the confidentiality of the proceeding.

(Exhibit 23 (emphasis added)).   Clarendon's argument to the International II Panel that arbitrators are not parties to Confidentiality Agreements is a both factually and legally incorrect. Arbitrators are bound by the undertakings of the ARIAS Confidentiality Agreement in the same way as the parties; it unequivocally says as much in the Confidentiality Agreement:   "the arbitration panel, who evidence by their execution hereof their undertaking to maintain Arbitration Information in confidence as set forth herein."  (Exhibit 1 § 4.a).  If this was not the case, there would be no provision for arbitrators to sign the agreement.

That arbitrators are bound by the Confidentiality Agreement makes perfect sense in light of the ethical rules for all ARIAS certified arbitrators contained Cannon VI of the ARIAS Code of Conduct.  Cannon VI states, *inter alia*:

1.     Arbitrators are in a relationship of trust with the parties and should not, at any time, use confidential information acquired during the arbitration proceeding to gain a personal advantage or advantage for others, or to affect adversely the interest of another.

2.     Unless otherwise agreed by the parties, or required or allowed by applicable rules or law, *arbitrators should keep confidential all matters relating to the arbitration proceedings and decisio***n**.

3.     It is not proper at any time for arbitrators to (1) inform anyone of an arbitration decision, whether interim or final, in advance of the time it is given to all parties; (2) *inform anyone concerning the contents of the deliberations of the arbitrators*; or (3) assist a party in post-arbitral proceedings, except as is required by law.

(Exhibit 24 (emphasis added)). Thus, even absent the Confidentiality Agreement, deliberations are intended to remain confidential.

Nevertheless, Clarendon would have this Court believe "Panel members do not become parties to the agreement" and the "signatures on the Confidentiality Agreement function as a judge's signature on a protective order." (Exhibit 23). Clarendon's position is utter nonsense. Through this sleight of hand of not having its Arbitrator sign the Confidentiality Agreement, Clarendon hopes to gain an unfair advantage in the VQS II Arbitration by having its Arbitrator evade the undertakings of the Confidentiality Agreement, eviscerate the ethical rules, and disclose the deliberations of the International II Panel.

Clarendon's Arbitrator's refusal to physically sign the Confidentiality Agreement is not, however, a license to breach confidentiality. First, whether Clarendon's Arbitrator signed the Confidentiality Agreement is irrelevant to the resolution of this case. There is no dispute that Clarendon signed the Confidentiality Agreement and therefore agreed to keep the International II Panel deliberations confidential. There is also no dispute that Clarendon contractually agreed that its breach could be enjoined by a court. Here, Clarendon has made it clear that it is not willing to abide by that agreement with its appointment of the same arbitrator from both cases. Clarendon has further made it clear that it has no intention of complying with the Confidentiality Agreement through its instruction to its Arbitrator not to do anything further in the face of Trustmark's request that the International II Panel execute the agreement.

Thus, the signature of Clarendon's Arbitrator on the Confidentiality Agreement is unnecessary for the relief sought by Trustmark. But even if it was, the relief should still issue because the International II Panel agreed to be bound by the agreement at the Organizational Meeting and the ARIAS Code of Conduct requires this result.

### 3. Trustmark Is Likely to Prevail on Its Request to Disqualify Clarendon's Arbitrator Because She Is Not Disinterested.

Clarendon's Arbitrator should be disqualified because she is no longer an appropriate arbitrator under the VQS II arbitration clause. Although the VQS II slip agreement was not memorialized in a full form agreement, the parties agree that they intended that the arbitration clause in the VQS II agreement would be identical to the arbitration article (Article XVI) in its immediately predecessor contract. (*See* Exhibits 5 and 6; and Docket Entry # 18, Clarendon Motion to Dismiss, at 3). The arbitration clause requires that all arbitrators be "disinterested." (Exhibit 5, Art. XVI; Exhibit 6). However, Clarendon's Arbitrator's service in the International II Arbitration renders her an interested arbitrator and therefore an ineligible candidate for the VQS II arbitration panel.

Where, as here, two disputes are governed by an arbitration clause requiring "disinterested" arbitrators, and the parties and the arbitrators in the first dispute are bound by a confidentiality agreement, the arbitrator's prior service renders her an interested arbitrator. Another court in this District had an opportunity to review a similar situation in *In'l Ins. Co. v. Certain Underwriters at Lloyd's, London*, 1992 U.S. Dist. LEXIS 22851 (N.D. Ill. Sept. 8, 1992), where the reinsurer sought disqualification of the ceding company's party-appointed arbitrator on the grounds that he was not "disinterested" as required by the contract because, among other things, he had served as the ceding company's party-appointed arbitrator in a prior arbitration with another reinsurer under a separate contract, which involved related issues.

In the *International Insurance* case decided under the Illinois Arbitration Act, the magistrate recommended that the court grant the reinsurer's motion to disqualify because, by virtue of his service on the prior panel, permitting the proposed arbitrator to serve in the current matter would necessarily create a risk that he would improperly base his ruling on *ex parte*

evidence, unavailable to the other panel members:

> The court also agrees with [the reinsurer] that it would be improper for Mr. Gregory to serve as a member of the [current] panel in view of his service as [the ceding company's] designated representative on the panel which is arbitrating disputes between [the ceding company] and [another reinsurer]. Although different contracts and periods of time are apparently involved, each arbitration will address disputes about claims handling under the same . . . program. . . . Mr. Gregory will therefore hear evidence in the [related] arbitration which is likely to bear on matters in dispute in [the current] arbitration, evidence which [the reinsurer] will not hear. Such *ex parte* consideration of evidence outside the [current] arbitration would be grounds for setting aside any award.

*Id*. at *6-7 (citations omitted). The risks identified by the *International Insurance* court are magnified here because Clarendon's counsel has already informed Trustmark and Clarendon's Arbitrator that the subject matter, content, and reasoning of the Panel's Final Award in the International II Arbitration will be raised in the VQS II Arbitration. (Exhibit 20, pgs. 38:20-45:25). *Cf. Evanston Ins. Co. v. Kansa Gen. Int'l Ins. Co. Ltd.*, 94 C 4957 (Oct. 17, 1994) (reprinted in Mealey's Litig. Rep. *Reinsurance* Vol. 5 #14).[6]

Because Clarendon's Arbitrator is not disinterested, this Court may therefore properly enjoin Clarendon from pursuing her participation in the VQS II Arbitration. *See Jefferson-Pilot Life Ins. Co. v. Leaf Re Reinsurance Co*., No. 00 C 5257, 2000 WL 1724661, at *2-3 (N.D. Ill. Nov. 20, 2000) (denying motion to dismiss complaint to enjoin pending arbitration because the potential arbitrators were not contractually eligible under the applicable arbitration clause); *Certain Underwriters at Lloyd's, London v. Continental Cas. Co.*, Nos. 97 C 3638, 97 C 3640 & 97 C 3643, 1997 WL 461035, at *4 (N.D. Ill. Aug. 11, 1997) ("[T]his court agrees that it has jurisdiction to review . . . an arbitrator's impartiality prior to the completion of an arbitration proceeding as part of the court's ability to enforce arbitration agreements." (citing 9 U.S.C. § 4));

---

[6] *See also First State Ins. Co. v. Employers Ins. of Wausau*, No. 99-12748-RWZ, slip op. at 2 (D. Mass. Feb. 23, 2000) (reprinted in Mealey's Litig. Rep. *Reinsurance* Vol. 10 #21) (stating a "disinterested" arbitrator is "free from interest, neutral, or indifferent").

*Evanston Ins. Co. v. Kansa Gen. Int'l Ins. Co. Ltd.*, No. 94 C 4957 (Oct. 17, 1994) (reprinted in

Mealey's Litig. Rep. *Reinsurance* Vol. 5 #14).

> **B.    Trustmark Will Be Irreparably Harmed in the Absence of an Injunction and Has No Adequate Remedy at Law**

An injunction should also issue because if the VQS II Arbitration proceeds before an

improperly constituted panel and if Clarendon or Clarendon's Arbitrator breach the

Confidentiality Agreement, then Trustmark will be irreparably harmed and will have no adequate

remedy at law. *See Cooper*, 196 F.3d at 813.

> **1.    Trustmark Will Be Irreparably Harmed by Clarendon's Breach of the Confidentiality Agreement if an Injunction Is Not Issued**

Trustmark will be irreparably harmed by Clarendon's and Clarendon's Arbitrator's

breach of the Confidentiality Agreement if a preliminary injunction is not issued. Because the

parties all understood the irreparable harm to result from a breach of the Confidentiality

Agreement, Trustmark, Clarendon, and Clarendon's Arbitrator agreed that:

> The parties recognize that serious injury could result to any party and its business if another party breaches its obligations under this Agreement. Therefore, **each party agrees that all parties will be entitled to seek a restraining order, injunction, or other equitable relief if another party breaches its obligations under this Agreement**, in addition to any other remedies and damages that would be available at law or equity.

(Exhibit 1, § 6 (emphasis added)). The parties selected injunctive relief as a proper remedy, and

this Court should enforce their choice. *See, e.g., Cortez Prods., Inc. v. Monterey Peninsula

Artists, Inc.*, No. 03 C 4630, 2004 WL 609375, at *2 (N.D. Ill. Mar. 22, 2004) ("In the absence

of ambiguous language, the court should enforce the contract as written" (citation omitted)).

And unless Clarendon is enjoined from breaching its contractual duties, Trustmark will suffer

immediate and irreparable injury, loss, or damage in that Clarendon will itself, and through

Clarendon's Arbitrator, use and disclose information subject to the Confidentiality Agreement.

In *ITT Educ. Servs.*, *Inc. v. Arce*, 533 F.3d 342, 347-48 (5th Cir. 2008), the Fifth Circuit addressed the irreparable harm that would result, where, as here, a litigant sought to use confidential information from an earlier arbitration as evidence in a later arbitration proceeding. In affirming the issuance of an injunction, the Fifth Circuit stated that "ITT will suffer irreparable harm because there is 'no cure for the breach of the confidentiality agreement.'" *Id.* at 347 (quoting *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 954 (5th Cir. 2001) (finding irreparable harm where counsel intentionally disclosed terms of a settlement agreement in violation of a confidentiality provision)). Clarendon, like the litigant in *ITT*, agreed that the International II Arbitration material would be maintained confidentially. It should not be heard to complain if it is required to live up to its agreement. Trustmark would be irreparably harmed if Clarendon were allowed to breach its agreement. *Id.* at 347-48.

### 2. Trustmark Will Suffer Irreparable Harm if Clarendon's Arbitrator Participates in the VQS II Arbitration

Trustmark also will be irreparably harmed if Clarendon's Arbitrator continues to be an arbitrator in the VQS II Arbitration despite the fact that she is no longer "disinterested" and is therefore ineligible to serve under the terms of the arbitration agreement. Injunctive relief is appropriate when an ineligible arbitrator purports to decide a dispute. *See Jefferson-Pilot Life Ins.*, 2000 WL 1724661, at *2-3 (allowing a claim to enjoin an arbitration to proceed because the potential arbitrators were not contractually eligible under the applicable arbitration clause). The harm resulting from an ineligible arbitrator is irreparable; Clarendon's Arbitrator is ineligible here, and Trustmark would be irreparably harmed if she were to continue to serve.

Moreover, Trustmark could suffer irreparable harm if Clarendon's Arbitrator remains on the VQS II Panel because Trustmark may be prohibited from later seeking relief for an improperly constituted panel. Recent Seventh Circuit case law suggests that challenges under

FAA § 5 must be brought to the Court's attention at the earliest possible time. *WellPoint, Inc. v. John Hancock Life Ins. Co.*, 576 F.3d 643 (7th Cir. 2009). In *WellPoint*, WellPoint's arbitrator resigned, and the parties, along with the panel, engaged in an agreed upon process to select a replacement. *Id*. at 645. After the panel issued its award, John Hancock filed a petition to vacate the arbitration award because "the panel was not selected in accordance with the arbitration agreement." *Id*. The Seventh Circuit found that John Hancock could not "wait and see" until the end of the dispute to challenge the arbitrator's appointment. *Id*. at 647. If Clarendon's Arbitrator is not replaced now, Trustmark could suffer irreparable harm by having to proceed before an improperly constituted panel and then have no opportunity to challenge Clarendon's Arbitrator's appointment.

### C. Clarendon Will Not be Significantly Harmed by a Preliminary Injunction

Under the Seventh Circuit's standard, the Court must balance the harm that Trustmark will suffer in the absence of an injunction against the harm (if any) that Clarendon would suffer if it were required to appoint a "disinterested" arbitrator in accordance with the parties' arbitration agreement. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U. S. of Am., Inc*., 549 F.3d 1079, 1086 (7th Cir. 2008) (stating the court "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted" (internal quotation marks and citation omitted)). "In so doing, the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (internal citation omitted).

Clarendon will not be significantly harmed if its interested arbitrator is replaced by a disinterested arbitrator. The VQS II arbitration panel has not been constituted yet, and no proceedings have occurred. Indeed, Clarendon has done nothing to pursue the VQS II

Arbitration since it demanded arbitration in July of 2006. The only "harm" that Clarendon will suffer is that it no longer has the tactical advantage of having an arbitrator who can impeach or contradict the International II Final Award by disclosing confidential information from the International II Arbitration. But Clarendon voluntarily contracted to have disinterested arbitrators and to maintain the confidentiality of the arbitration. *See, e.g., ITT Educ. Servs.*, *Inc. v. Arce*, 533 F.3d 342, 347-48 (5th Cir. 2008) (concluding that the balance of harms leans against a party who may be forced to comply with the confidentiality provisions to which it agreed). Clarendon should not be heard to complain about a situation it created, for surely it knew the risk in appointing the same arbitrator in both proceedings.

### D. A Preliminary Injunction Is in the Public Interest

The Court also needs to consider whether a preliminary injunction is in the "public interest." *Girl Scouts of Manitou Council*, 549 F.3d at 1086. To a large extent, courts have observed that commercial disputes like this one do not implicate the "public interest" when a preliminary injunction is sought. *See WFC Commodities Corp. v. Alston*, No. 00C 0044, 2000 WL 33534178, at *1 (N.D. Ill. Mar. 8, 2000) ("[T]here is no public interest in this commercial dispute between private parties"). However, to the extent that the interest of the public is implicated, there is a clear public interest in preventing Clarendon from making a mockery of the arbitration process by appointing the same arbitrator and purporting that she meets the arbitration agreement's requirement for a "disinterested" arbitrator.

While there is no public policy favoring arbitration, there is a public policy interest in enforcing parties' agreements to arbitrate just as any other contract would be enforced – "the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664 (7th Cir. 2009) (internal quotation marks and citations omitted). *See also* 9 U.S.C. § 4 ("A party

aggrieved by the alleged failure . . . to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement").  Here, Clarendon wants to have an interested person serve as an arbitrator in violation of a contractual requirement that she be "disinterested," and wants in the VQS II Arbitration to violate the Confidentiality Agreement by raising the subject matter, content, and reasoning of Panel's Final Award in the International II Arbitration. The public interest clearly favors injunctive relief in such circumstances.

**IV.**     **CONCLUSION**

     **WHEREFORE**, for the reasons stated above, Trustmark Insurance Company requests a preliminary injunction, to be made permanent after trial, enjoining Clarendon and its officers, agents, servants, employees, attorneys and other persons who are in active concert or participation with them, who receive notice of the order by personal service or otherwise, from:

    i.    breaching the Confidentiality Agreement entered by the parties and Clarendon's Arbitrator;

    ii.    appointing Clarendon's Arbitrator as an arbitrator in the VQS II Arbitration; and

    iii.    participating in the VQS II Arbitration so long as Clarendon's Arbitrator is purporting to participate as an arbitrator.

DATED: December 8, 2009       TRUSTMARK INSURANCE COMPANY

       /s  Everett J. Cygal
       By:   One of Its Attorneys
       David M. Spector
       Everett J. Cygal
       Amy M. Rubenstein
       SCHIFF HARDIN LLP
       233 S. Wacker Drive, Suite 6600
       Chicago, IL 60606-6473
       Tel:   (312) 258-5500

## CERTIFICATE OF SERVICE

I, Everett J. Cygal, do certify that on the 8th of December, 2009, the foregoing Memorandum of Law in Support of Trustmark Insurance Company's Motion for a Preliminary Injunction was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

G. Michael Halfenger
Brian Patrick Keenan
Foley & Lardner LLP
777 East Wisconsin Ave
Milwaukee, WI 53202-5306

/s  Everett J. Cygal
Everett J. Cygal

CH2\7990961.